UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 1:09-cr-103 |
| ) | MATTICE/CARTER |
| WALTER CARTER ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant Walter Carter's Motion to Suppress (Doc. 16) is before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). On April 24, 2009, police executed a search warrant for Carter's residence and searched his house, the vehicle he had been driving, and his person. Police seized cocaine, marijuana, digital scales, $748.90 in cash and a Western Union receipt for $100.00 sent to a woman in Memphis, Tennessee. The defendant seeks to have all this evidence suppressed pursuant to the Fourth Amendment of the United States Constitution. For the reasons stated herein, it is RECOMMENDED that the defendant's motion to suppress be DENIED.

II. Relevant Facts

A hearing was held on the defendant's motion to suppress on Tuesday, July 28, 2009.[1] Detective Lee Wolf and Detective Sully Batts of the Chattanooga Police Department were the only witnesses to testify.

---

[1] The parties were permitted to file post-hearing briefs which they did on August 8, 2009 and August 14, 2009.

1

*1. Detective Lee Wolf*

Detective Wolf testified to the following: He has been with the Chattanooga Police Department (CPD) since 1980. He has been assigned as a narcotics investigator for the past nine years. In early 2009, a confidential informant (CI) approached Detective Wolf with information that one Michael McCallie, aka Butter, and defendant Walter Carter, aka Boo, were dealing crack cocaine from their residence at 4603 Highland Avenue in Chattanooga.

Det. Wolf was familiar with defendant Carter as he had arrested Carter in 2007 on marijuana charges. From January 2009 to April 2009, Det. Wolf used this CI to make five controlled buys of crack and powder cocaine from the defendant's residence in Chattanooga, Tennessee located at 4603 Highland Avenue (also referred to as "the Highland Avenue residence"). Det. Wolf explained that the controlled buys were all made using the same procedure: the CI would place a phone call to Walter Carter to arrange the buy. Police searched the CI and his vehicle immediately before the buy. Police gave the CI marked money and instructed him to make no stops before reaching 4603 Highland Avenue. Police would observe the CI travel to 4603 Highland Avenue, go inside, and come back out. Police then would follow the CI to a prearranged place, retrieve the narcotics, and debrief with the CI. The buys ranged from $300-$400. The CI always turned over the contraband to Det. Wolf who would field test it to make certain it was, in fact, illegal drugs.

During the first controlled buy on January 30, 2009, the CI purchased crack and cocaine powder directly from Michael McCallie. During the second and fourth buys, February 13, 2009 and March 27, 2009, respectively, the CI purchased the narcotics directly from Walter Carter. The CI purchased crack and/or cocaine powder from Kenneth Smith during the third buy on

February 23, 2009. During the last buy on April 21, 2009, when the CI called Carter to arrange for the purchase of the illegal drugs, Carter informed the CI that he had to run to the store, would not be present at the Highland Avenue residence for the buy, and that another individual would give him the drugs. The CI purchased the narcotics during the last controlled buy at the Highland Avenue residence from an individual unknown to police and identified only as Kip.

The CI advised Det. Wolf that defendant Carter drove a black Super Sport Chevrolet Impala (Impala) and used that vehicle to store the crack and cocaine powder and to transport it from Michael McCallie's house to the Highland Avenue residence. The CI identified the Impala by the specific license tag number, Tennessee tag 150-QXL. Police determined the Impala was registered to a woman living in another part of town.

On March 27, 2009, Detective Wolf arranged a controlled buy with the CI. While police observed, Carter was seen leaving the Highland Avenue residence to go to the Impala. He retrieved something out of the Impala and returned to the house. Shortly thereafter, the CI left the Highland Avenue residence to meet Wolf at the prearranged location. At the prearranged location, the CI told police that Carter had left the Highland Avenue residence to go to the Impala to retrieve the drugs. The March 27, 2009 controlled buy was the only controlled buy where police observed Carter leave the Highland Avenue residence, go to the Impala and return to the Highland Avenue residence where the CI was located. However, during other controlled buys, Det. Wolf did see the Impala parked on the street outside Carter's residence, either in front of the Highland Avenue residence or in the back of the Highland Avenue residence on Chandler Avenue. Det. Wolf explained that the Highland Avenue residence does not have a garage or driveway. Further, on the day of the last controlled buy, April 21, 2009, Carter and co-defendant

Kenneth Smith were observed in the Impala about a mile and a half away from the Highland Avenue residence.

On the basis of the controlled buys, police observations of traffic coming and going inside the Highland Avenue residence, and statements from the CI, police obtained a search warrant for 4603 Highland Avenue. The warrant was obtained on April 24, 2009 and executed on the same day.

When Det. Wolf arrived at 4603 Highland Avenue with other officers to execute the search warrant, he saw the Impala parked on Highland Avenue directly in front of the Highland Avenue residence. The officers approached the side and front doors of the Highland Avenue residence. They announced themselves and thought they could hear running and things being knocked over. Believing evidence was about to be destroyed, the officers used a ram to enter the house. Carter was located on the sofa in the living room. Det. Wolf saw co-defendant Kenneth Smith in the bathroom, and it appeared he was attempting to flush evidence down the toilet. Wolf went to detain Smith while other officers including Sgt. Batts entered, detained, and handcuffed Carter. Police then searched a coffee table immediately next to Carter and found marijuana and an empty holster. At that point, Carter was placed under arrest and searched. Police found keys to the Highland Avenue residence and to the Impala on Carter as well as $748.90 in cash. The Impala was subsequently searched, and police found inside it a Western Union receipt for $100.00 sent to a woman in Memphis, Tennessee.

*2. Sergeant Sully Batts*

Sergeant Batts testified to the following: He has been with the CPD since 1982 and has spent the last fifteen years in the narcotics division. During his career, he has been involved in

more than a thousand search warrant executions. During the investigation of the Highland Avenue residence, Sgt. Batts was Det. Wolf's supervisor.

On April 24, 2009, at approximately 3 p.m., he assisted in the execution of a search warrant for 4603 Highland Avenue. He drove the raid van carrying eleven or twelve police officers to the Highland Avenue residence. Police arrived with so many officers because they were expecting Carter and Smith, individuals targeted in the investigation, to be present and they were aware that these individuals had a violent background. Batts was familiar with Carter and his criminal history including that defendant Carter had been arrested about a year ago at another location for a marijuana charge and that Carter had a conviction for a crime which had resulted in someone's death. Batts also knew that Carter had arranged for the controlled purchases of crack and powder cocaine with the CI at the Highland Avenue residence. In addition, Batts knew that Smith had assaulted a police officer with a knife sometime in the past. Batts was probably the fifth or sixth person who entered the Highland Avenue residence, and he went straight to Carter who was standing between the couch and coffee table and was the only adult in the living room. Officers Wolf and Ballard were trying to keep Smith from flushing cocaine down the toilet in the bathroom. Batts could hear officers yelling, "he's flushing the cocaine." Batts put Carter on the floor, handcuffed him, and kept his hands on Carter's hands so that Carter could not get to a weapon that might be hidden under the couch or in the coffee table. Batts then patted Carter down for a weapon and found nothing. While another officer watched Carter, Batts started searching the nearby coffee table where he found a bag of marijuana and an empty holster. At that point, Batts put Carter under arrest. Det. Fuller subsequently conducted a more thorough search of Carter, finding $748.90 in cash and keys to the car and house. The Impala was parked

5

on the street within a couple of feet of the mailbox directly in front of 4603 Highland Avenue. Batts accompanied Wolf as he searched the Impala and found the Western Union receipt.

Sgt. Batts also testified that the decision to arrest Carter was based on the following factors: the defendant had arranged the five controlled buys of crack and/or cocaine with the CI at the Highland Avenue residence, police had previously arrested the defendant on marijuana charges, Smith was caught attempting to flush cocaine down the toilet, digital scales were found in the bedroom, and Batts found marijuana in the coffee table within arms reach of Carter.

### III. Argument

The defendant seeks suppression of the evidence found in the search of his residence, the Impala, and his person. The undersigned will address these three areas separately.

*The Highland Avenue Residence*

When police searched the defendant's residence, they found cocaine, marijuana and digital scales. Defendant seeks to have these items suppressed on the ground that the search warrant for the residence was invalid. The Fourth Amendment prohibits unreasonable searches and seizures providing "no warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend IV*. To establish probable cause to justify a search warrant, an affidavit must set forth facts which indicate "a fair probability exists that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal citations omitted); *see also United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009); *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005). The Court must consider the totality of the circumstances as set out in the four corners of the affidavit. *Illinois v.*

6

*Gates*, 462 U.S. 213, 230 (1983) (totality of the circumstances standard); *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565 n. 8 (1971) (Court limited to review of affidavit itself); *United States v. Dyer,* __F.3d __, 2009 WL 2851304 * 2 (Sept. 8, 2009) (court must look to totality of the circumstances as set forth in the four corners of the affidavit.) Where an affidavit relies upon hearsay information from a confidential informant to supply probable cause, "a court must consider the veracity, reliability, and the basis of knowledge of that information as part of the totality of the circumstances for evaluating the impact of the information." *Frazier*, 423 F.3d at 532 (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)). Independent police corroboration of a confidential informant's story is not necessarily required to support probable cause, but where the affidavit lacks indicia of the informant's reliability, "courts insist that the affidavit contain substantial independent police corroboration." *Frazier*, 423 F.3d at 532; *see also*, *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005); *United States v. Woosley,* 361 F.3d 924, 927 (6th Cir. 2004); *United States v. Allen,* 211 F.3d 970, 976 (6th Cir.) (en banc), *cert. denied*, 531 U.S. 907 (2000).

      It appears uncontested that the search warrant affidavit on its face, if considered in its entirety, supports probable cause to search the Highland Avenue residence. In the affidavit, Det. Wolf states several controlled drugs buys were made at the Highland Avenue residence, one within the last 72 hours, using a CI with a long track record of reliability and trustworthiness. The affidavit details the careful manner in which the controlled buys were carried out and also states that short term traffic coming and going from the Highland Avenue residence indicative of drug trafficking was observed.

Defendant, however, argues that paragraphs 3, 4, and 5 of the affidavit contain falsehoods because these paragraphs contain sworn statements from Det. Wolf that conflict with his testimony at the suppression hearing. The defendant requests an additional hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978) to further investigate these contradictions. [2] Defendant also argues that because paragraphs 3, 4, and 5 contain falsehoods, they must be redacted from the search warrant affidavit which then renders the search warrant affidavit insufficient to support probable cause to search the Highland Avenue residence. Specifically, defendant argues that the individual referred to by Det. Wolf in his affidavit as John Doe Alias must be the person known to police only as "Kip," not defendant Carter. Carter notes that Det. Wolf testified at the suppression hearing that during the last controlled buy which occurred on April 21, 2009, the CI went to the house and purchased cocaine directly from "Kip," not Walter Carter. At the suppression hearing, when asked if Kip was the John Doe Alias in paragraph 3 of the affidavit who sold the drugs to the CI on April 21, 2009, Det. Wolf testified he was. Thus, concludes the defendant, the John Does Alias referenced in paragraphs 3, 4, and 5 of the affidavit is Kip, not Walter Carter. Carter also observes that paragraph 5 states John Doe Alias drove the black Chevrolet with Tennessee tag 150-QXL, and Wolf testified at the hearing that Carter, not Kip, drove the Impala. Thus, according to defendant, Wolf's statements in paragraph 5 of the affidavit that John Doe Alias drove the black Chevrolet with Tennessee tag 150-QXL (the Impala) is false.

---

[2] A hearing was granted on the defendant's motion to suppress in the instant case because the United States offered grounds other than the search warrant to justify law enforcement's search of the Impala and the defendant's person. It was during the course of this hearing that defendant developed information which he believes indicates portions of Det. Wolfe's statements in paragraphs 3, 4, and 5 of the search warrant affidavit are false.

8

Under *Franks v. Delaware*, a defendant must meet a two pronged test to merit an evidentiary hearing on the veracity of statements made in a search warrant affidavit. *United States v. Hill,* 142 F.3d 305, 310 (6th Cir. 1998). First, a defendant must make a substantial preliminary showing that the affidavit contains deliberately false statements; second, the defendant must show that exclusion of the inaccurate statements would render the affidavit insufficient to support probable cause to issue the search warrant. *Franks*, 438 U.S. at 155-56; *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008); *Hill*, 142 F.3d at 310. If the defendant is able to show at the evidentiary hearing by a preponderance of the evidence that the affiant made statements with deliberate or reckless disregard for the truth and those statements are necessary to support probable cause, then the search warrant is invalid. *Id.*

The Court has already had a hearing during which the defendant's counsel questioned Sgt. Wolf about the search warrant affidavit. Det. Wolf's testimony at the hearing was substantially consistent with his statements in the search warrant affidavit concerning the controlled buys. Wolf testified at the hearing that Walter Carter arranged all the controlled buys at the Highland Avenue residence and twice sold the drugs himself to the CI. Wolf also testified Carter drove a black Chevrolet Super Sport Impala with Tennessee tag 150-QXL. This particular testimony is consistent with paragraphs 3, 4, and 5 of the search warrant affidavit. The only variation from Sgt. Wolf's testimony and his affidavit is minor. In paragraph 3, Det. Wolf stated that within the last 72 hours the CI had been on the premises of the Highland Avenue residence and had seen cocaine in the possession of and the control of John Doe Alias. At the suppression hearing, Det. Wolf testified that while Carter arranged the April 21, 2009 controlled buy with the CI, Carter wasn't at the Highland Avenue residence when the controlled buy took place. Instead,

9

"Kip" sold the drugs to the CI. At the hearing, when defense counsel asked Det. Wolf if the John Doe Alias referenced in Paragraph 3 was Kip, Det. Wolf testified it was. But Det. Wolf did not testify that the use of "John Does Alias" referred to "Kip" throughout the affidavit. In fact, during the course of the hearing, it was clear to the undersigned that Wolf believed that the John Doe Alias referenced in the rest of the affidavit was Walter Carter. I do not conclude that Det. Wolf deliberately lied or even acted with reckless disregard of the truth in paragraph 3 of the affidavit. It appears to me that Det. Wolf unintentionally failed to distinguish in paragraph 3 of the affidavit from John Doe Alias (Carter) who arranged the buy and Kip who was actually present for the buy. This unintended misstep is not material and does not constitute a reckless disregard for the truth given that Walter Carter arranged all the controlled buys, all the controlled buys took place at the Highland Avenue residence, and the place to be searched was the Highland Avenue residence.

Furthermore, even without paragraphs 3, 4, and 5, the search warrant affidavit is sufficient to provide probable cause to issue the search warrant for the Highland Avenue residence. Paragraph 7 of the affidavit states:

> 7. The said informant has made at least five controlled buys from the above said address for your affiant, with one of these buys occurring within the last 72 hours. The following controls were in place: Under the direction and control of your affiant, the said informant was physically checked or searched by your affiant for any type of contraband, your affiant found none on the informant who was visually monitored entering the premises. The informant conducted the hand to hand drug transaction, specifically money for Cocaine. Your affiant then observed the informant leave the said premises. Your affiant, close in time thereafter personally retrieved from the informant Cocaine purchased by the informant and suspected to be Cocaine. Your affiant personally inspected the Cocaine and found it to match in color, texture, shape, and odor the controlled substance known as Cocaine. Your afffiant followed appropriate procedures or safeguards which ensured that the currency supplied to the informant prior to the purchase was spent

as directed, and your affiant again physically checked or searched the informant and found no other contraband on the informant. This purchases was made by the informant, the informant made no stops or had no contact with any individuals before handing Cocaine to your affiant.

Paragraphs 8-11 vouch for the reliability and credibility of the informant by stating the informant has been known to the affiant for four years and has provided information leading to the arrest and conviction of individuals for violations of narcotic laws at least eight times. This information, coupled with the fact that the Highland Avenue residence had been used on multiple times, as recently as 72 hours previously, on an ongoing basis as a place to conduct controlled drug transactions supports a fair probability that evidence of drug transactions will be found at the Highland Avenue residence. The identity of the John Doe Alias or the driver of the Impala is not crucial for purposes of securing a search warrant for the Highland Avenue residence because the five controlled buys establish the nexus between the crime being investigated and the place to be searched.

*The Impala*

The search warrant provides that law enforcement officers may search the Highland Avenue residence, "including all persons, containers, outbuildings and motor vehicles found within the curtilage" of the Highland Avenue residence. Defendant argues that the search warrant did not authorize police to search the Impala because it was parked on the street in front of the Highland Avenue residence just outside the curtilage. In its post suppression hearing brief, the government concedes the Impala was parked outside the curtilage. However, the government argues searching the Impala did not violate the Fourth Amendment because officers had probable cause to search the vehicle. The government also argues that the officers acted in good faith

11

believing that the warrant authorized them to search the Impala and, therefore, the exclusionary rule should not apply to require suppression of the receipt found in the Impala.

Police may search an automobile without a warrant provided there is probable cause to believe the vehicle contains evidence of a crime. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citing *California v. Carney,* 471 U.S. 386, 391 (1985)); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). The automobile search warrant exception has evolved from its initial rationale based on the "ready mobility" of an automobile to a rationale based on "the lesser expectation of privacy" in an automobile. *Smith*, 510 F.3d at 647 (citing *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996)); *California v. Carney*, 471 U.S. 386, 390-91 (1985); *Carroll v. United States*, 267 U.S. 132, 153 (1925)); *see also United States v. Redmond*, 2009 WL 1505541 * 9 (6th Cir. May 28, 2009) (the "automobile exception permits a police officer to search a vehicle without a warrant provided he or she has probable cause sufficient for obtaining a warrant.") Thus, there is no longer any exigency requirement to the automobile exception to the search warrant requirement. *Smith*, 510 F.3d at 647 (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) ("under our established precedent, the 'automobile exception' has no separate exigency requirement.")). As a result, if officers had probable cause to search the Impala when they did, then it is immaterial whether the search warrant authorized police to search the Impala.

Probable cause to search exists where there is a fair probability, based on the totality of the circumstances, that contraband or evidence of a crime will be found in the place to be searched. *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005); *United States v. McCraven,* 401 F.3d 693, 697 (6th Cir. 2005); *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002); *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001). Probable cause "requires

12

only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 212, 244 n.13. (1983). "[I]t is not necessary to eliminate all but one possible explanation in order to establish probable cause." *United States v. Delguyd,* 542 F.2d 346, 351 (6th Cir. 1976). Probable cause is a "flexible, common sense standard" which requires no showing that the officer's belief is correct or more likely true than false. *Texas v. Brown*, 460 U.S. 730, 742 (1983); *Farm Labor Org. Comm. v. Ohio State Highway State*, 308 F.3d 523, 555 (6th Cir. 2002). "A police officer may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas v. United States*, 517 U.S. 690, 700 (1996); *United States v. Cortez*, 449 U.S. 411, 418 (1981). "[W]here police have probable cause to believe that a vehicle may contain contraband, they may search the entire vehicle and any containers located within in it." *United States v. Manns*, 999 F.2d 966, 969 (6th Cir. 1993) (citing *California v. Acevedo*, 500 U.S. 565 (1991)). The government bears the burden of proof to show the search was justified under the Fourth Amendment when police have conducted a warrantless search. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007); *United States v. Haynes*, 301 F.3d at 669, 677 (6th Cir. 2002).

     Det. Wolf testified at the suppression hearing that, in addition to having a search warrant, he believed he had probable cause independent of the search warrant to search the Impala. At the time he searched the Impala, Det. Wolf had the following information: (1) the CI, with a known track record for credibility and veracity, said Carter used the Impala to carry cocaine he sold to customers, (2) police had conducted controlled buys with the CI and arranged by Carter at the Highland Avenue residence five times and the Impala was seen during these buys parked directly in front of or behind the Highland Avenue residence, (3) on March 27, 2009, during one of the

13

controlled buys with the CI, Carter exited the Highland Avenue residence to go to the Impala parked outside, retrieved something from the Impala, went back inside, and conducted the drug transaction with the CI, (4) on April 21, 2009, Carter arranged for a buy with the CI and was seen shortly thereafter in the Impala about a mile and a half from the Highland Avenue residence while the CI went to the Highland Avenue residence to make the controlled buy from someone known as Kip, (5) immediately before searching the Impala, Det. Wolf found cocaine, marijuana, and drug paraphernalia in the Highland Avenue residence, (6) during the execution of the search warrant, the Impala was parked just outside the Highland Avenue residence on the street, and (7) Det. Wolf had arrested Carter on marijuana charges in 2007. When all this information is considered together, it provides an adequate basis to conclude that, at the time Det. Wolf searched the Impala, a fair probability existed that evidence of drug trafficking would be found in the Impala.

*The Defendant*

The only evidence found on the defendant was $748.90 in cash. Defendant argues that the search warrant failed to set forth "with particularity the manner to identify currency used in drug transactions." (Defendant's Amended Motion to Suppress and Memorandum at 5, Doc. 34). According to the defendant, the warrant which permits officers to seize "United States currency that are the proceed [sic] of drug transactions" is "to [sic] vague for an officer to be able to ascertain U.S. Currency that is the proceed form [sic] drug transactions from U.S. currency that is from other sources without the officer using his discretion." *Id*.

Had the seized cash been found somewhere in the Highland Avenue residence instead of on the defendant's person, this argument would need to be addressed, but there was another basis

14

upon which seizure of the cash was justified. The cash was found in a search incident to the defendant's arrest. Police may conduct a full search of an individual without a search warrant following his lawful arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973); *United States v. Smith*, 549 F.3d 355, 361 (6th Cir. 2008). Thus the question before the undersigned now is whether the defendant's arrest was lawful.

"A police officer has probable cause [to arrest] if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003); (citing *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir.2002)). "A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform 'a prudent person, or one of reasonable caution,' that the suspect 'has committed, is committing, or is about to commit an offense.' *Friedley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

Defendant asserts this case is similar to *Ybarra v. Illinois*, 444 U.S. 85 (1979) wherein a search warrant was issued for a tavern suspected to be a location for heroin sales. The police searched all the patrons in the tavern including the defendant simply because they were present in the tavern at the time the search warrant was executed. In finding the police's search of Ybarra unreasonable, the Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* at 91 (internal citation omitted).

*Ybarra* is not similar to the case at bar. At the time Sgt. Batts decided to place the defendant under arrest, Batts had an abundance of information beyond the defendant's "mere propinquity to others independently suspected of criminal activity" and "particularized" to the defendant: Batts and the other officers were in the process of executing a search warrant at a residence for which they had probable cause to believe ongoing drug sales were occurring. Batts already was familiar with Carter, and he knew he (Carter) had been arrested a little over a year ago on a marijuana charge. Batts knew Carter had arranged for the controlled buys which had taken place at the Highland Avenue residence, the last one occurring as recently as 72 hours earlier. Upon entry into the Highland Avenue residence, Batts heard another police officer shout that co-defendant Smith was trying to flush cocaine down the toilet. Police found digital scales in the bedroom. Batts found marijuana in the coffee table immediately next to the defendant and an empty firearm holster within arms reach of the defendant. And, in significant contrast to *Ybarra*, the defendant was standing in a private residence, *his* residence, not a tavern where any member of the public could enter without specific permission. *See United States v. Ridge*, 329 F.3d 535, 541 (6th Cir.2003) (reasoning that because officers were searching a suspected methamphetamine lab, they could reasonably infer that a customer or distributor would arrive on the premises); *United States v. Reid,* 997 F.2d 1576, 1578-79 (D.C.Cir.1993) ("Common sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possessing drugs.") All these factors, when considered together, gave rise to a fair probability that Carter was involved in a

16

drug crime involving marijuana and cocaine. Thus his arrest was reasonable, and the subsequent search leading to the seizure of the cash was also reasonable.

IV.  Conclusion

For the reasons stated herein, it is RECOMMENDED that defendant's motion to suppress (Doc. 16) be DENIED.[3]

Dated:  September 24, 2009          s/William B. Mitchell Carter
                                                         UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).